(Slip Opinion) OCTOBER TERM, 2020 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LANGE *v.* CALIFORNIA

### CERTIORARI TO THE COURT OF APPEAL OF CALIFORNIA, FIRST APPELLATE DIVISION

No. 20–18.  Argued February 24, 2021—Decided June 23, 2021

This case arises from a police officer's warrantless entry into petitioner Arthur Lange's garage.  Lange drove by a California highway patrol officer while playing loud music and honking his horn.  The officer began to follow Lange and soon after turned on his overhead lights to signal that Lange should pull over.  Rather than stopping, Lange drove a short distance to his driveway and entered his attached garage.  The officer followed Lange into the garage.  He questioned Lange and, after observing signs of intoxication, put him through field sobriety tests.  A later blood test showed that Lange's blood-alcohol content was three times the legal limit.

The State charged Lange with the misdemeanor of driving under the influence.  Lange moved to suppress the evidence obtained after the officer entered his garage, arguing that the warrantless entry violated the Fourth Amendment.  The Superior Court denied Lange's motion, and its appellate division affirmed.  The California Court of Appeal also affirmed.  It concluded that Lange's failure to pull over when the officer flashed his lights created probable cause to arrest Lange for the misdemeanor of failing to comply with a police signal.  And it stated that Lange could not defeat an arrest begun in a public place by retreating into his home.  The pursuit of a suspected misdemeanant, the court held, is always permissible under the exigent-circumstances exception to the warrant requirement.  The California Supreme Court denied review.

*Held*: Under the Fourth Amendment, pursuit of a fleeing misdemeanor suspect does not always—that is, categorically—justify a warrantless entry into a home.  Pp. 3–16.

(a) The Court's Fourth Amendment precedents counsel in favor of a

case-by-case assessment of exigency when deciding whether a suspected misdemeanant's flight justifies a warrantless home entry. The Fourth Amendment ordinarily requires that a law enforcement officer obtain a judicial warrant before entering a home without permission. *Riley* v. *California*, 573 U. S. 373, 382. But an officer may make a warrantless entry when "the exigencies of the situation," considered in a case-specific way, create "a compelling need for official action and no time to secure a warrant." *Kentucky* v. *King*, 563 U. S. 452, 460; *Missouri* v. *McNeely*, 569 U. S. 141, 149. The Court has found that such exigencies may exist when an officer must act to prevent imminent injury, the destruction of evidence, or a suspect's escape.

The *amicus* contends that a suspect's flight always supplies the exigency needed to justify a warrantless home entry and that the Court endorsed such a categorical approach in *United States* v. *Santana*, 427 U. S. 38. The Court disagrees. In upholding a warrantless entry made during a "hot pursuit" of a felony suspect, the Court stated that Santana's "act of retreating into her house" could "not defeat an arrest" that had "been set in motion in a public place." *Id.*, at 42–43. Even assuming that *Santana* treated fleeing-felon cases categorically, that statement still does not establish a flat rule permitting warrantless home entry whenever a police officer pursues a fleeing misdemeanant. *Santana* did not resolve the issue of misdemeanor pursuit; as the Court noted in a later case, "the law regarding warrantless entry in hot pursuit of a fleeing misdemeanant is not clearly established" one way or the other. *Stanton* v. *Sims*, 571 U. S. 3, 8, 10.

Misdemeanors run the gamut of seriousness, and they may be minor. States tend to apply the misdemeanor label to less violent and less dangerous crimes. The Court has held that when a minor offense (and no flight) is involved, police officers do not usually face the kind of emergency that can justify a warrantless home entry. See *Welsh* v. *Wisconsin*, 466 U. S. 740, 742–743. Add a suspect's flight and the calculus changes—but not enough to justify a categorical rule. In many cases, flight creates a need for police to act swiftly. But no evidence suggests that every case of misdemeanor flight creates such a need.

The Court's Fourth Amendment precedents thus point toward assessing case by case the exigencies arising from misdemeanants' flight. When the totality of circumstances shows an emergency—a need to act before it is possible to get a warrant—the police may act without waiting. Those circumstances include the flight itself. But pursuit of a misdemeanant does not trigger a categorical rule allowing a warrantless home entry. Pp. 3–12.

(b) The common law in place at the Constitution's founding similarly does not support a categorical rule allowing warrantless home entry whenever a misdemeanant flees. Like the Court's modern precedents,

the common law afforded the home strong protection from government intrusion and it generally required a warrant before a government official could enter the home. There was an oft-discussed exception: An officer, according to the common-law treatises, could enter a house to pursue a felon. But in the misdemeanor context, officers had more limited authority to intrude on a fleeing suspect's home. The commentators generally agreed that the authority turned on the circumstances; none suggested a rule authorizing warrantless entry in every misdemeanor-pursuit case. In short, the common law did not have—and does not support—a categorical rule allowing warrantless home entry when a suspected misdemeanant flees. Pp. 12–16.

Vacated and remanded.

KAGAN, J., delivered the opinion of the Court, in which BREYER, SOTOMAYOR, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined, and in which THOMAS, J., joined as to all but Part II–A. KAVANAUGH, J., filed a concurring opinion. THOMAS, J., filed an opinion concurring in part and concurring in the judgment, in which KAVANAUGH, J., joined as to Part II. ROBERTS, C. J., filed an opinion concurring in the judgment, in which ALITO, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———

No. 20–18

———

## ARTHUR GREGORY LANGE, PETITIONER *v.* CALIFORNIA

*ON WRIT OF CERTIORARI TO THE COURT OF APPEAL OF CALIFORNIA, FIRST APPELLATE DISTRICT*

[June 23, 2021]

JUSTICE KAGAN delivered the opinion of the Court.

The Fourth Amendment ordinarily requires that police officers get a warrant before entering a home without permission. But an officer may make a warrantless entry when "the exigencies of the situation" create a compelling law enforcement need. *Kentucky* v. *King*, 563 U. S. 452, 460 (2011). The question presented here is whether the pursuit of a fleeing misdemeanor suspect always—or more legally put, categorically—qualifies as an exigent circumstance. We hold it does not. A great many misdemeanor pursuits involve exigencies allowing warrantless entry. But whether a given one does so turns on the particular facts of the case.

I

This case began when petitioner Arthur Lange drove past a California highway patrol officer in Sonoma. Lange, it is fair to say, was asking for attention: He was listening to loud music with his windows down and repeatedly honking his horn. The officer began to tail Lange, and soon afterward turned on his overhead lights to signal that Lange should pull over. By that time, though, Lange was only

about a hundred feet (some four-seconds drive) from his home. Rather than stopping, Lange continued to his driveway and entered his attached garage. The officer followed Lange in and began questioning him. Observing signs of intoxication, the officer put Lange through field sobriety tests. Lange did not do well, and a later blood test showed that his blood-alcohol content was more than three times the legal limit.

The State charged Lange with the misdemeanor of driving under the influence of alcohol, plus a (lower-level) noise infraction. Lange moved to suppress all evidence obtained after the officer entered his garage, arguing that the warrantless entry had violated the Fourth Amendment. The State contested the motion. It contended that the officer had probable cause to arrest Lange for the misdemeanor of failing to comply with a police signal. See, *e.g.*, Cal. Veh. Code Ann. §2800(a) (West 2015) (making it a misdemeanor to "willfully fail or refuse to comply with a lawful order, signal, or direction of a peace officer"). And it argued that the pursuit of a suspected misdemeanant always qualifies as an exigent circumstance authorizing a warrantless home entry. The Superior Court denied Lange's motion, and its appellate division affirmed.

The California Court of Appeal also affirmed, accepting the State's argument in full. 2019 WL 5654385, *1 (2019). In the court's view, Lange's "fail[ure] to immediately pull over" when the officer flashed his lights created probable cause to arrest him for a misdemeanor. *Id.*, at *7. And a misdemeanor suspect, the court stated, could "not defeat an arrest which has been set in motion in a public place" by "retreat[ing] into" a house or other "private place." See *id.*, at *6–*8 (internal quotation marks omitted). Rather, an "officer's 'hot pursuit' into the house to prevent the suspect from frustrating the arrest" is always permissible under the exigent-circumstances "exception to the warrant requirement." *Id.*, at *8 (some internal quotation marks omitted).

That flat rule resolved the matter: "Because the officer was in hot pursuit" of a misdemeanor suspect, "the officer's warrantless entry into [the suspect's] driveway and garage [was] lawful." *Id.*, at \*9. The California Supreme Court denied review.

Courts are divided over whether the Fourth Amendment always permits an officer to enter a home without a warrant in pursuit of a fleeing misdemeanor suspect. Some courts have adopted such a categorical rule, while others have required a case-specific showing of exigency.[1] We granted certiorari, 592 U. S. \_\_\_ (2020), to resolve the conflict. Because California abandoned its defense of the categorical rule applied below in its response to Lange's petition, we appointed Amanda Rice as *amicus curiae* to defend the Court of Appeal's judgment. She has ably discharged her responsibilities.

## II

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." As that text makes clear, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City* v. *Stuart*, 547 U. S. 398, 403 (2006). That

---

[1] Compare, *e.g.*, 2019 WL 5654385, \*7–\*8 (case below) (applying a categorical rule); *Bismarck* v. *Brekhus*, 2018 ND 84, ¶ 27, 908 N. W. 2d 715, 719–720 (same); *Commonwealth* v. *Jewett*, 471 Mass. 624, 634–635, 31 N. E. 3d 1079, 1089 (2015) (same); *People* v. *Wear*, 229 Ill. 2d 545, 568, 571, 893 N. E. 2d 631, 644–646 (2008) (same); *Middletown* v. *Flinchum*, 95 Ohio St. 3d 43, 44–45, 765 N. E. 2d 330, 332 (2002) (same); *State* v. *Ricci*, 144 N. H. 241, 244–245, 739 A. 2d 404, 407–408 (1999) (same), with, *e.g.*, *State* v. *Markus*, 211 So. 3d 894, 906–907 (Fla. 2017) (requiring a case-specific showing); *Mascorro* v. *Billings*, 656 F. 3d 1198, 1207 (CA10 2011) (same); *Butler* v. *State*, 309 Ark. 211, 216–217, 829 S. W. 2d 412, 415 (1992) (same); *State* v. *Bolte*, 115 N. J. 579, 597–598, 560 A. 2d 644, 654–655 (1989) (same); see also *Stanton* v. *Sims*, 571 U. S. 3, 6–7 (2013) (*per curiam*) (noting the split).

standard "generally requires the obtaining of a judicial warrant" before a law enforcement officer can enter a home without permission. *Riley* v. *California*, 573 U. S. 373, 382 (2014) (internal quotation marks omitted). But not always: The "warrant requirement is subject to certain exceptions." *Brigham City*, 547 U. S., at 403.

One important exception is for exigent circumstances. It applies when "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable." *King*, 563 U. S., at 460 (internal quotation marks omitted). The exception enables law enforcement officers to handle "emergenc[ies]"—situations presenting a "compelling need for official action and no time to secure a warrant." *Riley*, 573 U. S., at 402; *Missouri* v. *McNeely*, 569 U. S. 141, 149 (2013). Over the years, this Court has identified several such exigencies. An officer, for example, may "enter a home without a warrant to render emergency assistance to an injured occupant[,] to protect an occupant from imminent injury," or to ensure his own safety. *Brigham City*, 547 U. S., at 403; *Riley*, 573 U. S., at 388. So too, the police may make a warrantless entry to "prevent the imminent destruction of evidence" or to "prevent a suspect's escape." *Brigham City*, 547 U. S., at 403; *Minnesota* v. *Olson*, 495 U. S. 91, 100 (1990) (internal quotation marks omitted). In those circumstances, the delay required to obtain a warrant would bring about "some real immediate and serious consequences"—and so the absence of a warrant is excused. *Welsh* v. *Wisconsin*, 466 U. S. 740, 751 (1984) (quoting *McDonald* v. *United States*, 335 U. S. 451, 460 (1948) (Jackson, J., concurring)).

Our cases have generally applied the exigent-circumstances exception on a "case-by-case basis." *Birchfield* v. *North Dakota*, 579 U. S. 438, ___ (2016) (slip op., at 16). The exception "requires a court to examine whether an emergency justified a warrantless search in each particular case." *Riley*, 573 U. S., at 402. Or put more curtly, the exception is

"case-specific." *Id.*, at 388. That approach reflects the nature of emergencies. Whether a "now or never situation" actually exists—whether an officer has "no time to secure a warrant"—depends upon facts on the ground. *Id.*, at 391 (internal quotation marks omitted); *McNeely*, 569 U. S., at 149 (internal quotation marks omitted). So the issue, we have thought, is most naturally considered by "look[ing] to the totality of circumstances" confronting the officer as he decides to make a warrantless entry. *Id.*, at 149.

The question here is whether to use that approach, or instead apply a categorical warrant exception, when a suspected misdemeanant flees from police into his home. Under the usual case-specific view, an officer can follow the misdemeanant when, but only when, an exigency—for example, the need to prevent destruction of evidence—allows insufficient time to get a warrant. The appointed *amicus* asks us to replace that case-by-case assessment with a flat (and sweeping) rule finding exigency in every case of misdemeanor pursuit. In her view, those "entries are categorically reasonable, regardless of whether" any risk of harm (like, again, destruction of evidence) "materializes in a particular case." Brief for Court-Appointed *Amicus Curiae* 31. The fact of flight from the officer, she says, is itself enough to justify a warrantless entry. (The principal concurrence agrees.) To assess that position, we look (as we often do in Fourth Amendment cases) both to this Court's precedents and to the common-law practices familiar to the Framers.

A

The place to start is with our often-stated view of the constitutional interest at stake: the sanctity of a person's living space. "[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida* v. *Jardines*, 569 U. S. 1, 6 (2013). At the Amendment's "very core," we have said, "stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion."

*Collins* v. *Virginia*, 584 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 5)
(internal quotation marks omitted).  Or again: "Freedom"
in one's own "dwelling is the archetype of the privacy pro-
tection secured by the Fourth Amendment"; conversely,
"physical entry of the home is the chief evil against which
[it] is directed." *Payton* v. *New York*, 445 U. S. 573, 585,
587 (1980) (internal quotation marks omitted).  The
Amendment thus "draw[s] a firm line at the entrance to the
house." *Id.*, at 590.  What lies behind that line is of course
not inviolable.  An officer may always enter a home with a
proper warrant.  And as just described, exigent circum-
stances allow even warrantless intrusions.  See *ibid.*; *supra*,
at 4.  But the contours of that or any other warrant excep-
tion permitting home entry are "jealously and carefully
drawn," in keeping with the "centuries-old principle" that
the "home is entitled to special protection." *Georgia* v. *Ran-
dolph*, 547 U. S. 103, 109, 115 (2006) (internal quotation
marks omitted); see *Caniglia* v. *Strom*, 593 U. S. \_\_\_, \_\_\_
(2021) (slip op., at 4) ("[T]his Court has repeatedly declined
to expand the scope" of "exceptions to the warrant require-
ment to permit warrantless entry into the home").  So we
are not eager—more the reverse—to print a new permission
slip for entering the home without a warrant.

The *amicus* argues, though, that we have already created
the rule she advocates.  In *United States* v. *Santana*, 427
U. S. 38 (1976), the main case she relies on, police officers
drove to Dominga Santana's house with probable cause to
think that Santana was dealing drugs, a felony under the
applicable law.  When the officers pulled up, they saw San-
tana standing in her home's open doorway, some 15 feet
away.  As they got out of the van and yelled "police," San-
tana "retreated into [the house's] vestibule." *Id.*, at 40.  The
officers followed her in, and discovered heroin.  We upheld
the warrantless entry as one involving a police "hot pur-
suit," even though the chase "ended almost as soon as it be-
gan." *Id.*, at 43.  Citing "a realistic expectation that any

delay would result in destruction of evidence," we recognized the officers' "need to act quickly." *Id.*, at 42–43. But we framed our holding in broader terms: Santana's "act of retreating into her house," we stated, could "not defeat an arrest" that had "been set in motion in a public place." *Ibid.* The *amicus* takes that statement to support a flat rule permitting warrantless home entry when police officers (with probable cause) are pursuing any suspect—whether a felon or a misdemeanant. See Brief for *Amicus Curiae* 11, 26. For support, she points to a number of later decisions describing *Santana* in dicta as allowing warrantless home entries when police are "in 'hot pursuit' of a fugitive" or "a fleeing suspect." *E.g.*, *Steagald* v. *United States*, 451 U. S. 204, 221 (1981); *King*, 563 U. S., at 460. The concurrence echoes her arguments.

We disagree with that broad understanding of *Santana*, as we have suggested before. In rejecting the *amicus*'s view, we see no need to consider Lange's counterargument that *Santana* did not establish *any* categorical rule—even one for fleeing felons. See Brief for Petitioner 7, 25 (contending that *Santana* is "entirely consistent" with "case-by-case exigency analysis" because the Court "carefully based [its] holding on [the] specific facts" and "circumstances"). Assuming *Santana* treated fleeing-felon cases categorically (that is, as *always* presenting exigent circumstances allowing warrantless entry), see, *e.g.*, *Stanton* v. *Sims*, 571 U. S. 3, 8 (2013) (*per curiam*); *McNeely*, 569 U. S., at 149; *King*, 563 U. S., at 450, it still said nothing about fleeing misdemeanants. We said as much in *Stanton*, when we approved qualified immunity for an officer who had pursued a suspected misdemeanant into a home. Describing the same split of authority we took this case to address, we stated that "the law regarding warrantless entry in hot pursuit of a fleeing misdemeanant is not clearly established" (so that the officer could not be held liable for damages). 571 U. S., at 6, 10. In other words, we found that neither *Santana* nor

any other decision had resolved the matter one way or the other. And we left things in that unsettled state. See 571 U. S., at 10. *Santana*, we noted, addressed a police pursuit "involv[ing] a felony suspect," 571 U. S., at 9; whether the same approach governed a misdemeanor chase was an issue for a future case.

Key to resolving that issue are two facts about misdemeanors: They vary widely, but they may be (in a word) "minor." *Welsh*, 466 U. S., at 750. In California and elsewhere, misdemeanors run the gamut of seriousness. As the *amicus* notes, some involve violence. California, for example, classifies as misdemeanors various forms of assault. See Cal. Penal Code Ann. §241 (West Cum. Supp. 2021); Brief for *Amicus Curiae* 15a–16a. And across the country, "many perpetrators of domestic violence are charged with misdemeanors," despite "the harmfulness of their conduct." *Voisine* v. *United States*, 579 U. S. 686, ___ (2016) (slip op., at 1). So "a 'felon' is" not always "more dangerous than a misdemeanant." *Tennessee* v. *Garner*, 471 U. S. 1, 14 (1985). But calling an offense a misdemeanor usually limits prison time to one year. See 1 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure §1.8(c) (4th ed. Supp. 2020). States thus tend to apply that label to less violent and less dangerous crimes. In California, it is a misdemeanor to litter on a public beach. See Cal. Penal Code Ann. §374.7(a) (2020). And to "negligently cut" a plant "growing upon public land." §384a(a)(2), (f). And to "willfully disturb[] another person by loud and unreasonable noise." §415(2). And (last one) to "artificially color[] any live chicks [or] rabbits." §599(b). In forbidding such conduct, California is no outlier. Most States count as misdemeanors such offenses as traffic violations, public intoxication, and disorderly conduct. See, *e.g.*, Tex. Transp. Code Ann. §545.413(a), (d) (West 2011) (driving without a seatbelt); Ill. Comp. Stat., ch. 610, §90/1 (West 2018) (drinking alcohol in a railroad

car); Ark. Code Ann. §5–71–207(a)(3), (b) (2016) (using obscene language likely to promote disorder). So the *amicus*'s (and concurrence's) rule would cover lawbreakers of every type, including quite a few hard to think alarming.

This Court has held that when a minor offense alone is involved, police officers do not usually face the kind of emergency that can justify a warrantless home entry. In *Welsh*, officers responded to a call about a drunk driver only to discover he had abandoned his vehicle and walked home. See 466 U. S., at 742–743. So no police pursuit was necessary, hot or otherwise. The officers just went to the driver's house, entered without a warrant, and arrested him for a "nonjailable" offense. *Ibid.* The State contended that exigent circumstances supported the entry because the driver's "blood-alcohol level might have dissipated while the police obtained a warrant." *Id.*, at 754. We rejected that argument on the ground that the driver had been charged with only a minor offense. "[T]he gravity of the underlying offense," we reasoned, is "an important factor to be considered when determining whether any exigency exists." *Id.*, at 753. "[W]hen only a minor offense has been committed" (again, without any flight), there is reason to question whether a compelling law enforcement need is present; so it is "particularly appropriate" to "hesitat[e] in finding exigent circumstances." *Id.*, at 750. And we concluded: "[A]pplication of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense" is involved. *Id.*, at 753.[2]

——————

[2] The concurrence is wrong to say that *Welsh* applies only to nonjailable offenses, and not to minor crimes that are labeled misdemeanors. See *post*, at 12–13 (ROBERTS, C. J., concurring in judgment). No less than four times, *Welsh* framed its holding as applying to "minor offenses" generally. 466 U. S., at 750, 752–753. (By contrast, the word "nonjailable" does not appear in its legal analysis.) The decision cited lower court cases

Add a suspect's flight and the calculus changes—but not enough to justify the *amicus*'s categorical rule. We have no doubt that in a great many cases flight creates a need for police to act swiftly. A suspect may flee, for example, because he is intent on discarding evidence. Or his flight may show a willingness to flee yet again, while the police await a warrant. But no evidence suggests that every case of misdemeanor flight poses such dangers. Recall that misdemeanors can target minor, non-violent conduct. See *supra*, at 8–9. *Welsh* held that when that is so, officers can probably take the time to get a warrant. And at times that will be true even when a misdemeanant has forced the police to pursue him (especially given that "pursuit" may cover just a few feet of ground, see *supra*, at 6). Those suspected of minor offenses may flee for innocuous reasons and in non-threatening ways. Consider from the casebooks: the man with a mental disability who, in response to officers asking him about "fidgeting with [a] mailbox," retreated in "a hurried manner" to his nearby home. *Carroll* v. *Ellington*, 800 F. 3d 154, 162 (CA5 2015). Or the teenager "driving without taillights" who on seeing a police signal "did not stop but drove two blocks to his parents' house, ran inside, and hid in the bathroom." *Mascorro* v. *Billings*, 656 F. 3d 1198, 1202 (CA10 2011). In such a case, waiting for a warrant is unlikely to hinder a compelling law enforcement need. See *id.*, at 1207 ("The risk of flight or escape was somewhere between low and nonexistent[,] there was no evidence which could have potentially been destroyed[,] and there

---

prohibiting warrantless home entries when the defendant had committed a misdemeanor. See *id.*, at 752. And its essential rationale applies to all minor crimes, however labeled. As the Court stated (quoting an earlier Justice Jackson opinion): It would "display[] a shocking lack of all sense of proportion" to say that "private homes, even quarters in a tenement, may be indiscriminately invaded at the discretion of any suspicious police officer engaged in following up offenses that involve no violence or threats of it." *Id.*, at 751 (quoting *McDonald* v. *United States*, 335 U. S. 451, 459 (1948) (concurring opinion)).

were no officer or public safety concerns"). Those non-emergency situations may be atypical. But they reveal the overbreadth—fatal in this context—of the *amicus*'s (and concurrence's) rule, which would treat a dangerous offender and the scared teenager the same. In misdemeanor cases, flight does not always supply the exigency that this Court has demanded for a warrantless home entry.

Our Fourth Amendment precedents thus point toward assessing case by case the exigencies arising from misde-meanants' flight. That approach will in many, if not most, cases allow a warrantless home entry. When the totality of circumstances shows an emergency—such as imminent harm to others, a threat to the officer himself, destruction of evidence, or escape from the home—the police may act without waiting. And those circumstances, as described just above, include the flight itself.[3] But the need to pursue a misdemeanant does not trigger a categorical rule allowing home entry, even absent a law enforcement emergency. When the nature of the crime, the nature of the flight, and

——————

[3] Given that our rule allows warrantless home entry when emergencies like these exist, we think the concurrence's alarmism misplaced. See, *e.g.*, *post*, at 2 (opinion of ROBERTS, C. J.) (bewailing "danger[]" and "ab-surd[ity]"). The concurrence spends most of its time worrying about cases in which there are exigencies above and beyond the flight itself: when, for example, the fleeing misdemeanant will "get a gun and take aim from inside" or "flush drugs down the toilet." *Post*, at 2, 8. But again: When an officer reasonably believes those exigencies exist, he does not need a categorical misdemeanor-pursuit rule to justify a warrantless home entry. (And contrary to the concurrence's under-explained sugges-tion, see *post*, at 7–8, assessing exigencies is no harder in this context than in any other.) The only cases in which we and the concurrence reach a different result are cases involving flight alone, without exigencies like the destruction of evidence, violence to others, or escape from the home. It is telling that—although they are our sole disagreement—the concur-rence hardly talks about those "flight alone" cases. Apparently, it taxes even the concurrence to justify as an "exigency" a warrantless entry based only on a misdemeanant's prior retreat into his home—when the police officers do not reasonably believe anything harmful will happen in the time it takes to get a warrant.

surrounding facts present no such exigency, officers must respect the sanctity of the home—which means that they must get a warrant.

B

The common law in place at the Constitution's founding leads to the same conclusion. That law, we have many times said, may be "instructive in determining what sorts of searches the Framers of the Fourth Amendment regarded as reasonable." *E.g.*, *Steagald*, 451 U. S., at 217. And the Framers' view provides a baseline for our own day: The Amendment "must provide *at a minimum* the degree of protection it afforded when it was adopted." *United States* v. *Jones*, 565 U. S. 400, 411 (2012); see *Jardines*, 569 U. S., at 5. Sometimes, no doubt, the common law of the time is hard to figure out: The historical record does not reveal a limpid legal rule. See, *e.g.*, *Payton*, 445 U. S., at 592–597. Here, we find it challenging to map every particular of the common law's treatment of warrantless home entries. But the evidence is clear on the question before us: The common law did not recognize a categorical rule enabling such an entry in every case of misdemeanor pursuit.

Like our modern precedents, the common law afforded the home strong protection from government intrusion. As this Court once wrote: "The zealous and frequent repetition of the adage that a 'man's house is his castle' made it abundantly clear that both in England and in the Colonies 'the freedom of one's house' was one of the most vital elements of English liberty." *Id.*, at 596–597 (footnote omitted); see *Semayne's Case*, 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 195 (K. B. 1604) ("[T]he house of every one is as to him as his castle and fortress, as well for his defen[s]e against injury and violence, as for his repose" (footnote omitted)); 3 W. Blackstone, Commentaries on the Laws of England 288 (1768) ("[E]very man's house is looked upon by the law to

be his castle of defen[s]e and asylum").[4]  To protect that in-
terest, "prominent law lords, the Court of Common Pleas,
the Court of King's Bench, Parliament," and leading trea-
tise writers all "c[a]me to embrace" the "understanding"
that generally "a warrant must issue" before a government
official could enter a house.  Donohue, The Original Fourth
Amendment, 83 U. Chi. L. Rev. 1181, 1238–1239 (2016); see
Davies, Recovering the Original Fourth Amendment, 98
Mich. L. Rev. 547, 642–646 (1999).  That did not mean the
Crown got the message; its officers often asserted power to
intrude into any home they pleased—thus adding to the col-
onists' list of grievances.  See *Steagald*, 451 U. S., at 220.
But the law on the books offered a different model: "To enter
a man's house" without a proper warrant, Lord Chief Jus-
tice Pratt proclaimed in 1763, is to attack "the liberty of the
subject" and "destroy the liberty of the kingdom." *Huckle* v.
*Money*, 2 Wils. K. B. 206, 207, 95 Eng. Rep. 768, 769 (K. B.
1763).  That was the idea behind the Fourth Amendment.

There was an oft-discussed exception: An officer, accord-
ing to the day's treatises, could enter a house to pursue a
felon.  The felony category then was a good deal narrower
than now.  Many modern felonies were "classified as misde-
meanors" at common law, with the felony label mostly re-
served for crimes "punishable by death." *Garner*, 471 U. S.,
at 13–14; see 4 W. Blackstone, Commentaries on the Laws
of England 98 (1791) (Blackstone).  In addressing those se-
rious crimes, the law "allow[ed of] extremities" to meet "ne-

––––––––
   [4] In a 1763 Parliamentary debate, about searches made to enforce a
tax, William Pitt the Elder orated as follows: "The poorest man may in
his cottage bid defiance to all the forces of the Crown.  It may be frail; its
roof may shake; the wind may blow through it; the storm may enter; the
rain may enter; but the King of England cannot enter—all his force dares
not cross the threshold of the ruined tenement!" *Miller* v. *United States*,
357 U. S. 301, 307, and n. 7 (1958) (citing The Oxford Dictionary of Quo-
tations 379 (2d ed. 1953); 15 T. Hansard, Parliamentary History of Eng-
land, col. 1307 (1813)).

cessity." R. Burn, The Justice of the Peace, and Parish Of-
ficer 86 (6th ed. 1758). So if a person suspected "upon prob-
able grounds" of a felony "fly and take house," Sir Matthew
Hale opined, then "the constable may break open the door,
tho he have no warrant." 2 Pleas of the Crown 91–92 (1736)
(Hale). Sergeant William Hawkins set out a more restric-
tive rule in his widely read treatise. He wrote that a con-
stable, "with or without a warrant," could "break open
doors" if "pursu[ing]" a person "known to have committed"
a felony—but not if the person was only "under a probable
suspicion." 2 Pleas of the Crown 138–139 (1787) (Hawkins).
On the other hand, Sir William Blackstone went broader
than Hale. A constable, he thought, could "break open
doors"—no less than "upon a justice's warrant"—if he had
"probable suspicion [to] arrest [a] felon," even absent flight
or pursuit. Blackstone 292. The commentators thus dif-
fered on the scope of the felony exception to the warrant
requirement. But they agreed on one thing: It was indeed
a *felony* exception. All their rules applied to felonies as a
class, and to no other whole class of crimes.

In the misdemeanor context, officers had more limited
authority to intrude on a fleeing suspect's home.[5] Once
again, some of the specifics are uncertain, and commenta-
tors did not always agree with each other. But none sug-
gested any kind of all-misdemeanor-flight rule. Instead,
their approval of entry turned on the circumstances. One
set of cases involved what might be called pre-felonies.
Blackstone explained that "break[ing] open doors" was al-
lowable not only "in case of [a] felony" but also in case of "a
dangerous wounding whereby [a] felony is likely to ensue."
*Ibid.* In other words, the felony rule extended to crimes that
would become felonies if the victims died. See Hale 94.[6]

---

[5] Note, though, that if a person had already been arrested and then
escaped from custody, an officer could always search for him at home.
See 2 W. Hawkins, Pleas of the Crown 87 (1721).

[6] Both felonies and pre-felonies justified the common law's "hue and

Another set of cases involved crimes, mostly violent themselves, liable to provoke felonious acts. Often called "affrays" or "breaches of the peace," a typical example was "the fighting of two or more persons" to "the terror of his majesty's subjects." Blackstone 145, 150.[7] Because that conduct created a "danger of felony"—because when it occurred, "there is likely to be manslaughter or bloodshed committed"—"the constable may break open the doors to keep the peace." Hale 90, 95 (emphasis deleted); see Hawkins 139 (blessing a warrantless entry "where those who have made an affray in [the constable's] presence fly to a house and are immediately pursued"). Hale also approved a warrantless entry to stop a more mundane form of harm: He (though not other commentators) thought a constable could act to "suppress the disorder" associated with "drinking or noise in a house at an unseasonable time of night." Hale 95. But differences aside, all the commentators focused on the facts of cases: When a suspected misdemeanant, fleeing or otherwise, threatened no harm, the constable had to get a warrant.

The common law thus does not support a categorical rule allowing warrantless home entry when a misdemeanant flees. It had a rule of that kind for felonies. But much as

——————

cry": when a constable or other person "raise[d] the power of the towne"— "with horn and with voice"—to pursue an offender. 3 E. Coke, Institutes of the Laws of England 116 (1644); Blackstone 293. Most of the common-law authorities approved warrantless home entries upon a hue and cry. But because that process was generally available only to apprehend felons and those who had "dangerously wounded any person," it did not enlarge the range of qualifying offenses. Hale 98; see Brief for Constitutional Accountability Center as *Amicus Curiae* 17–18.

[7] The term "breach of the peace" can today encompass many kinds of behavior, and even in common-law times it "meant very different things in different" contexts. *Atwater* v. *Lago Vista*, 532 U. S. 318, 327, n. 2 (2001). But "[m]ore often than not, when used in reference to common-law arrest power, the term seemed to connote an element of violence." *Id.*, at 327–328, n. 2.

in *Welsh* centuries later, the common law made distinctions based on "the gravity of the underlying offense." 466 U. S., at 753. When it came to misdemeanors, flight alone was not enough. Whether a constable could make a warrantless entry depended as well on other circumstances suggesting a potential for harm and a need to act promptly.[8] In that way, the common-law rules (even if sometimes hard to discern with precision) mostly mirror our modern caselaw. The former too demanded—and often found—a law enforcement exigency before an officer could "break open" a fleeing misdemeanant's doors. Blackstone 292.

## III

The flight of a suspected misdemeanant does not always justify a warrantless entry into a home. An officer must consider all the circumstances in a pursuit case to determine whether there is a law enforcement emergency. On many occasions, the officer will have good reason to enter—to prevent imminent harms of violence, destruction of evidence, or escape from the home. But when the officer has time to get a warrant, he must do so—even though the misdemeanant fled.

Because the California Court of Appeal applied the categorical rule we reject today, we vacate its judgment and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

––––––––––

[8] The concurrence professes to disagree with this conclusion, see *post*, at 17–19 (opinion of ROBERTS, C. J.), but its account of the common law ends up in much the same place as ours. The concurrence recognizes a categorical rule permitting warrantless home entry in pursuit of fleeing felons. See *post*, at 17. But for misdemeanants, the concurrence presents only discrete circumstances—mostly the same as ours—allowing home entry without a warrant. *Post*, at 17–18. Those particular instances of permissible entry do not create a categorical rule.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–18

_____

## ARTHUR GREGORY LANGE, PETITIONER *v.* CALIFORNIA

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL OF CALIFORNIA, FIRST APPELLATE DISTRICT

[June 23, 2021]

JUSTICE KAVANAUGH, concurring.

The Court holds that an officer may make a warrantless entry into a home when pursuing a fleeing misdemeanant if an exigent circumstance is also present—for example, when there is a risk of escape, destruction of evidence, or harm to others. I join the Court's opinion. I also join Part II of JUSTICE THOMAS's concurrence regarding how the exclusionary rule should apply to hot pursuit cases.

I add this brief concurrence simply to underscore that, in my view, there is almost no daylight in practice between the Court's opinion and THE CHIEF JUSTICE's opinion concurring in the judgment.

In his thoughtful opinion, THE CHIEF JUSTICE concludes that pursuit of a fleeing misdemeanant should *itself* constitute an exigent circumstance. The Court disagrees. As I see it, however, the difference between THE CHIEF JUSTICE's approach and the Court's approach will be academic in most cases. That is because cases of fleeing misdemeanants will almost always *also* involve a recognized exigent circumstance—such as a risk of escape, destruction of evidence, or harm to others—that will still justify warrantless entry into a home. See *ante,* at 1, 4, 16; see also, *e.g., City and County of San Francisco* v. *Sheehan*, 575 U. S. 600, 612 (2015); *Kentucky* v. *King*, 563 U. S. 452, 460 (2011);

*Brigham City* v. *Stuart*, 547 U. S. 398, 403 (2006); *Minnesota* v. *Olson*, 495 U. S. 91, 100 (1990).  As Lange's able counsel forthrightly acknowledged at oral argument, the approach adopted by the Court today will still allow the police to make a warrantless entry into a home "nine times out of 10 or more" in cases involving pursuit of a fleeing misdemeanant.  Tr. of Oral Arg. 34.

Importantly, moreover, the Court's opinion does not disturb the long-settled rule that pursuit of a fleeing *felon* is itself an exigent circumstance justifying warrantless entry into a home.  See *United States* v. *Santana*, 427 U. S. 38, 42–43 (1976); cf. *Stanton* v. *Sims*, 571 U. S. 3, 8, 9 (2013) (*per curiam*).  In other words, the police may make a warrantless entry into the home of a fleeing felon regardless of whether other exigent circumstances are present.

With those observations, I join the Court's opinion.

# SUPREME COURT OF THE UNITED STATES

No. 20–18

ARTHUR GREGORY LANGE, PETITIONER *v.*
CALIFORNIA

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL OF
CALIFORNIA, FIRST APPELLATE DISTRICT

[June 23, 2021]

JUSTICE THOMAS, with whom JUSTICE KAVANAUGH joins
as to Part II, concurring in part and concurring in the judgment.

I join the majority opinion, except for Part II–A, which
correctly rejects the argument that suspicion that a person
committed *any* crime justifies warrantless entry into a
home in hot pursuit of that person. I write separately to
note two things: the general case-by-case rule that the
Court announces today is subject to historical, categorical
exceptions; and under our precedent, the federal exclusionary rule does not apply to evidence discovered in the course
of pursuing a fleeing suspect.

I

The majority sets out a general rule requiring a case-by-
case inquiry when an officer enters a home without a warrant in pursuit of a person suspected of committing a misdemeanor. But history suggests several categorical exceptions to this rule. First, warrantless entry is categorically
allowed when a person is arrested and escapes. *E.g.,* J. Parker, Conductor Generalis 28–29 (1788) (constables may
break into houses without a warrant "[w]herever a person
is lawfully arrested for any cause, and afterwards escapes,
and shelters himself in an house"); *ante,* at 14, n. 5. This
exception is potentially very broad. See *Torres* v. *Madrid*,

592 U. S. \_\_\_, \_\_\_ (2021) (slip op., at 1) (holding that an arrest occurs whenever an officer applies physical force to the body with intent to restrain); *Genner* v. *Sparks*, 6 Mod. 173, 174, 87 Eng. Rep. 928, 929 (Q. B. 1704). Second, authorities at common law categorically allowed warrantless entry when in hot pursuit of a person who committed an affray. *Ante,* at 15. Third, those authorities allowed the same for what the majority calls certain "pre-felonies." *Ante,* at 14. Finally, some authorities appear to have allowed warrantless entry when in pursuit of a person who had breached the peace. See, *e.g.,* 2 M. Hale, Pleas of the Crown 95 (1736) (Hale); Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 798, 802–803 (1924)). What crimes amounted to "breach of peace" for purposes of warrantless entry is not immediately clear. The term sometimes was used to refer to violence, but the majority recognizes historical support for a broader definition. *Ante,* at 15 (citing Hale 95). And cases decided before and after the Fourteenth Amendment was ratified similarly used the term "breach of peace" in a broad sense. *E.g., State* v. *Lafferty*, 5 Del. 491 (1854) ("blow[ing] a trumpet at night through the streets"); *Hawkins* v. *Lutton*, 95 Wis. 492, 494, 70 N. W. 483 (1897) ("loud, profane, and indecent" language).

I join the relevant parts of the majority on the understanding that its general case-by-case rule does not foreclose historical, categorical exceptions. Although the majority unnecessarily leads with doctrine before history, it does not disturb our regular rule that history—not court-created standards of reasonableness—dictates the outcome whenever it provides an answer. See, *e.g., Wilson* v. *Arkansas*, 514 U. S. 927, 931 (1995); *Virginia* v. *Moore*, 553 U. S. 164, 171 (2008).

I also join on the understanding that the majority has not sought to settle the contours of any of these historical exceptions.

## II

I also write to point out that even if the state courts on remand conclude that the officer's entry here was unlawful, the federal exclusionary rule does not require suppressing any evidence.

"[O]fficers who violated the Fourth Amendment were traditionally considered trespassers." *Utah* v. *Strieff*, 579 U. S. 232, 237 (2016). For that reason, "individuals subject to unconstitutional searches or seizures historically enforced their rights through tort suits or self-help." *Ibid.* But beginning in the 20th century, this Court created a new remedy: exclusion of evidence in criminal trials. *Ibid.*

Establishing a violation of the Fourth Amendment, though, does not automatically entitle a criminal defendant to exclusion of evidence. Far from it. "[T]he exclusionary rule is not an individual right." *Herring* v. *United States*, 555 U. S. 135, 141 (2009). It is a "'prudential' doctrine created by this Court," *Davis* v. *United States*, 564 U. S. 229, 236 (2011) (citation omitted), and there is always a "high obstacle for those urging application of the rule," *Pennsylvania Bd. of Probation and Parole* v. *Scott*, 524 U. S. 357, 364–365 (1998). Relevant here, the rule "does not apply when the costs of exclusion outweigh its deterrent benefits." *Strieff*, 579 U. S., at 235.

On the benefits side, "we have said time and again that the *sole*" factor courts can consider is "deter[ring] misconduct by law enforcement." *Davis*, 564 U. S., at 246. And not just any misconduct. The exclusionary rule developed to deter "*intentional* conduct that was *patently* unconstitutional." *Herring*, 555 U. S., at 143 (emphasis added). For the past several decades, we have thus declined to exclude evidence where exclusion would not substantially deter "intentional" and "flagrant" behavior. *Id.,* at 144. For example, the exclusionary rule does not apply where "some intervening circumstance" arises between unconstitutional conduct and discovery of evidence, *Strieff*, 579 U. S., at 238;

where evidence would inevitably have been discovered, *ibid.*; or where officers have acted in good faith, *United States* v. *Leon*, 468 U. S. 897, 908 (1984).

On the other side of the ledger, we consider all "costs." *E.g., Davis*, 564 U. S., at 237. One cost is especially salient: excluding evidence under the Fourth Amendment always obstructs the "'truth-finding functions of judge and jury.'" *Leon*, 468 U. S., at 907; accord, *Nix* v. *Williams*, 467 U. S. 431, 443 (1984) (recognizing "the public interest in having juries receive all probative evidence"). This interference with the purpose of the judicial system also creates a down-stream risk that "some guilty defendants may go free or re-ceive reduced sentences." *Leon*, 468 U. S., at 907.

By itself, this high cost makes exclusion under our prece-dent rarely appropriate. "Suppression of evidence . . . has always been our last resort, not our first impulse." *Hudson* v. *Michigan*, 547 U. S. 586, 591 (2006). When additional costs are present, the balance tips decisively against exclu-sion.

Cases of fleeing suspects involve more than enough added costs to render the exclusionary rule inapplicable. First, our precedents make clear that the exclusionary rule does not apply when it would encourage bad conduct by criminal defendants. For example, evidence obtained during an un-lawful search is still admissible to impeach a witness be-cause exclusion would create "'a license to use perjury.'" *United States* v. *Havens*, 446 U. S. 620, 626 (1980). Here, exclusion is inappropriate because it would encourage sus-pects to flee. Second, our precedents similarly make clear that criminal defendants cannot use the exclusionary rule as "a shield against" their own bad conduct. *Walder* v. *United States*, 347 U. S. 62, 65 (1954). In most—if not all—States, fleeing from police after a lawful order to stop is a crime. All the evidence that petitioner seeks to exclude is evidence that inevitably would have been discovered had he

complied with the officer's order to stop. A criminal defendant should "not . . . be put in a better position than [he] would have been in if no illegality had transpired." *Nix*, 467 U. S., at 443–444.

Aware of the substantial costs created by the exclusionary rule, courts have sometimes narrowed the protections historically afforded by the Fourth Amendment to avoid having to exclude evidence. See *Collins* v. *Virginia*, 584 U. S. \_\_\_, \_\_\_ (2018) (THOMAS, J., concurring) (slip op., at 1); A. Amar, The Constitution and Criminal Procedure: First Principles 30 (1997) ("Judges do not like excluding bloody knives, so they distort doctrine"). But it should be the judicially created remedy, not the Fourth Amendment, that contracts in the face of that pressure. Courts should follow the plain dictates of our precedent: Officers cannot chase a fleeing person into a home simply because that person is suspected of having committed any misdemeanor, but if the officer nonetheless does so, exclusion under the Fourth Amendment is improper. Criminal defendants must rely on other remedies.

# SUPREME COURT OF THE UNITED STATES

———

No. 20–18

———

## ARTHUR GREGORY LANGE, PETITIONER *v.* CALIFORNIA

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL OF CALIFORNIA, FIRST APPELLATE DISTRICT

[June 23, 2021]

CHIEF JUSTICE ROBERTS, with whom JUSTICE ALITO joins, concurring in the judgment.

Suppose a police officer on patrol responds to a report of a man assaulting a teenager. Arriving at the scene, the officer sees the teenager vainly trying to ward off the assailant. The officer attempts to place the assailant under arrest, but he takes off on foot. He leads the officer on a chase over several blocks as the officer yells for him to stop. With the officer closing in, the suspect leaps over a fence and then stands on a home's front yard. He claims it's his home and tells the officer to stay away. What is the officer to do?

The Fourth Amendment and our precedent—not to mention common sense—provide a clear answer: The officer can enter the property to complete the arrest he lawfully initiated outside it. But the Court today has a different take. Holding that flight, on its own, can never justify a warrantless entry into a home (including its curtilage), the Court requires that the officer: (1) stop and consider whether the suspect—if apprehended—would be charged with a misdemeanor or a felony, and (2) tally up other "exigencies" that *might* be present or arise, *ante*, at 1, 4, before (3) deciding whether he can complete the arrest or must instead seek a warrant—one that, in all likelihood, will not arrive for hours. Meanwhile, the suspect may stroll into the home and then dash out the back door. Or, for all the officer

knows, get a gun and take aim from inside.

The Constitution does not demand this absurd and dangerous result. We should not impose it. As our precedent makes clear, hot pursuit is not merely a setting in which other exigent circumstances justifying warrantless entry might emerge. It is itself an exigent circumstance. And we have never held that whether an officer may enter a home to complete an arrest turns on what the fleeing individual was suspected of doing before he took off, let alone whether that offense would later be charged as a misdemeanor or felony. It is the flight, not the underlying offense, that has always been understood to justify the general rule: "Police officers may enter premises without a warrant when they are in hot pursuit of a fleeing suspect." *Kentucky* v. *King*, 563 U. S. 452, 460 (2011). The Court errs by departing from that well-established rule.

I

A

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause." While the Amendment does not specify when a warrant must be obtained, we have typically required that officers secure one before entering a home to execute a search or seizure. *King*, 563 U. S., at 459. We have also, however, recognized exceptions to that requirement "because the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City* v. *Stuart*, 547 U. S. 398, 403 (2006).

In some instances the Court has determined that this question of reasonableness can be decided by application of a rule for a particular type of case. *Mitchell* v. *Wisconsin*, 588 U. S. ___, ___, n. 2 (2019) (plurality opinion) (slip op., at 9, n. 2); see *Illinois* v. *McArthur*, 531 U. S. 326, 330 (2001)

("[T]his Court has interpreted the Amendment as establishing rules and presumptions."). This approach reflects our recognition of the need "to provide clear guidance to law enforcement." *Riley* v. *California*, 573 U. S. 373, 398 (2014). We strive to "draw standards sufficiently clear and simple to be applied with a fair prospect of surviving judicial second-guessing months and years after an arrest or search is made." *Atwater* v. *Lago Vista*, 532 U. S. 318, 347 (2001).

We have, for example, established general rules giving effect to the "well-recognized exception [that] applies when the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *King*, 563 U. S., at 460 (some alterations in original; internal quotation marks omitted). In fact, "our exigency case law is full of general rules" that provide "guidance on how police should handle [such] cases." *Mitchell*, 588 U. S., at \_\_\_, n. 3 (slip op., at 9, n. 3) (internal quotation marks omitted). These rules allow warrantless entry into the home when necessary to "protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence." *Carpenter* v. *United States*, 585 U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (slip op., at 21–22). Or—relevant here—"to pursue a fleeing suspect." *Id.*, at \_\_\_ (slip op., at 21).

We take a case-by-case approach in deciding whether a search or seizure was conducted in reaction to an exigent circumstance, such as whether an officer had an objective basis to "fear the imminent destruction of evidence." *Birchfield* v. *North Dakota*, 579 U. S. 438, \_\_\_ (2016) (slip op., at 15). But once faced with an exigency, our rule is clear: officers are "not bound to learn anything more or wait any longer before going in." *United States* v. *Banks*, 540 U. S. 31, 40 (2003).

Today, the Court holds that hot pursuit merely sets the table for other exigencies that may emerge to justify warrantless entry, such as imminent harm. This comes as a

surprise. For decades we have consistently recognized pursuit of a fleeing suspect as an exigency, one that on its own justifies warrantless entry into a home.

Almost a half century ago in *United States* v. *Santana*, 427 U. S. 38 (1976), we considered whether hot pursuit supports warrantless home entry. We held that such entry was justified when Santana "retreat[ed] into her house" after a drug transaction upon hearing law enforcement "shout[] 'police'" and seeing them "display[] their identification." *Id.*, at 40, 42. As we explained, "a suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place." *Id.*, at 43. Our interpretation of the Fourth Amendment did not hinge on whether the offense that precipitated her withdrawal was a felony or a misdemeanor. See *Stanton* v. *Sims*, 571 U. S. 3, 9 (2013) (*per curiam*).

We have repeatedly and consistently reaffirmed that hot pursuit is itself an exigent circumstance. See, *e.g.*, *Carpenter*, 585 U. S., at ____ (slip op., at 21) ("[E]xigencies include the need to pursue a fleeing suspect."); *Collins* v. *Virginia*, 584 U. S. ___, ___ (2018) (slip op., at 12) (distinguishing prior case approving warrantless entry onto the curtilage as best sounding in "hot pursuit"); *Birchfield*, 579 U. S., at ___ (slip op., at 15) (exception for exigent circumstances authorizes "the warrantless entry of private property . . . when police are in hot pursuit of a fleeing suspect"); *King*, 563 U. S., at 460 ("Police officers may enter premises without a warrant when they are in hot pursuit of a fleeing suspect."); *Brigham City*, 547 U. S., at 403 ("We have held, for example, that law enforcement officers may make a warrantless entry onto private property . . . to engage in 'hot pursuit' of a fleeing suspect." (citations omitted)); *Steagald* v. *United States*, 451 U. S. 204, 221 (1981) ("[W]arrantless entry of a home would be justified if the police were in 'hot pursuit' of a fugitive."); see also *Mitchell*, 588 U. S., at ___ (SOTOMAYOR, J., dissenting) (slip op., at 11) ("'hot pursuit'

of a fleeing suspect" qualifies as an exigency); *Missouri* v. *McNeely*, 569 U. S. 141, 176–177 (2013) (THOMAS, J., dissenting) (same).

These cases, it bears repeating, have not viewed hot pursuit as merely the background against which *other* exigencies justifying warrantless entry might arise. See, *e.g.*, *Carpenter*, 585 U. S., at \_\_\_–\_\_\_ (slip op., at 21–22) (identifying destruction of evidence, emergency aid, *and* hot pursuit as separate exigencies); *Birchfield*, 579 U. S., at \_\_\_ (slip op., at 15) (same); *McNeely*, 569 U. S., at 148–149 (opinion of the Court) (same); *King,* 563 U. S., at 460 (same); *Brigham City*, 547 U. S., at 403 (same); see also *Mitchell*, 588 U. S., at \_\_\_ (SOTOMAYOR, J., dissenting) (slip op., at 11) (same). And our decisions do not dismiss the existence of an exigency—including hot pursuit—based on the underlying offense that precipitated law enforcement action, even if known. To the contrary, until today, we have explicitly rejected invitations to do so. See *Brigham City*, 547 U. S., at 405 (dismissing defendants' contention that offenses at issue were "not serious enough" to justify reliance on the emergency aid doctrine); *Michigan* v. *Fisher*, 558 U. S. 45, 47 (2009) (*per curiam*); see also *Atwater*, 532 U. S., at 354 (rejecting exception for "very minor criminal offense[s]" to rule allowing warrantless arrests).

The Court displays little patience for this precedent. With regard to *Santana*, the Court concedes that "we framed our holding in broad[] terms." *Ante*, at 7. Yet it narrows those terms based on rationales that played no role in the decision. The Court then brushes off our slew of cases reaffirming *Santana*'s broad holding as nothing more than "dicta." *Ante*, at 7. I would not override decades of guidance to law enforcement in favor of a new rule that provides no guidance at all.

## B

A proper consideration of the interests at stake confirms

the position our precedent amply supports.  Pursuit impli-
cates substantial government interests, regardless of the of-
fense precipitating the flight.  It is the flight, not the under-
lying offense, that justifies the entry.

At the start, every hot pursuit implicates the government
interest in ensuring compliance with law enforcement.  *Cal-
ifornia* v. *Hodari D.*, 499 U. S. 621, 627 (1991).  Flight is a
direct attempt to evade arrest and thereby frustrate our
"society's interest in having its laws obeyed."  *Terry* v. *Ohio*,
392 U. S. 1, 26 (1968).  Disregarding an order to yield to law
enforcement authority cannot be dismissed with a shrug of
the shoulders simply because the underlying offense is re-
garded as "innocuous," *ante*, at 10.  As the many state
courts to approve of warrantless entry in hot pursuit have
reminded us, "[l]aw enforcement is not a child's game of
prisoners base, or a contest, with apprehension and convic-
tion depending upon whether the officer or defendant is the
fleetest of foot."  *Commonwealth* v. *Jewett*, 471 Mass. 624,
634, 31 N. E. 3d 1079, 1089 (2015) (quoting *State* v. *Ricci*,
144 N. H. 241, 245, 739 A. 2d 404, 408 (1999)).

Flight also always involves the "paramount" government
interest in public safety.  *Scott* v. *Harris*, 550 U. S. 372, 383
(2007); see *Hodari D.*, 499 U. S., at 627 ("Street pursuits
always place the public at some risk, and compliance with
police orders to stop should therefore be encouraged.").  A
fleeing suspect "intentionally place[s] himself and the pub-
lic in danger."  *Scott*, 550 U. S., at 384.  Vehicular pursuits,
in particular, are often catastrophic.  See Dept. of Justice,
Bureau of Justice Statistics, B. Reaves, Police Vehicle Pur-
suits, 2012–2013, p. 6 (May 2017) (average of about one
death per day in the United States from vehicle pursuits
from 1996 to 2015).  Affording suspects the opportunity to
evade arrest by winning the race rewards flight and encour-
ages dangerous behavior.

And the problems do not end there because hot pursuit

often gives rise to multiple other exigencies, such as destruction of evidence, violence, and escape. The Court acknowledges this reality, but then posits that not "*every* case of misdemeanor flight poses such dangers." *Ante*, at 10 (emphasis added). Of course not. But we have never required such a level of certainty before crafting a general rule that law enforcement can follow. For example, in *Washington* v. *Chrisman*, 455 U. S. 1 (1982), we held that an officer may accompany an arrestee into his residence without any showing of exigency and regardless of the "nature of the offense for which the arrest was made," because there "is no way for an officer to predict reliably how a particular subject will react to arrest" and "the possibility that an arrested person will attempt to escape if not properly supervised is obvious." *Id.*, at 6–7. In *Michigan* v. *Summers*, 452 U. S. 692 (1981), we concluded that, although "no special danger to the police" was suggested by the evidence in the record, the execution of a search warrant merited a categorical rule allowing detention of present individuals because it was the "kind of transaction" that could give rise to other exigencies. *Id.*, at 702. And in *United States* v. *Robinson*, 414 U. S. 218 (1973), we held that the search incident to arrest exception applies to all arrests regardless "what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found," because arrests require "quick *ad hoc* judgment[s]." *Id.*, at 235.

Such concerns are magnified here. The act of pursuing a fleeing suspect makes simultaneously assessing which other exigencies might arise especially difficult to ascertain "on the spur (and in the heat) of the moment." *Atwater*, 532 U. S., at 347. The Court disputes this proposition, *ante,* at 11, n. 3, but the difficulty of discerning hidden weapons or drugs on a suspect running or driving away seems clear to us.

The risks to officer safety posed by the Court's suggestion

that an officer simply abandon pursuit and await a warrant are severe. We are warned in this case that "attempting warrant service for an unknown suspect in an unknown home at night is flat dangerous." Brief for Sonoma County District Attorney's Office et al. as *Amici Curiae* 33. Whether at night or during the day, the officer is obviously vulnerable to those inside the home while awaiting a warrant, including danger from a suspect who has already demonstrated himself to be undeterred by police orders. See, *e.g.*, *Thompson* v. *Florence*, 2019 WL 3220051, \*4 (ND Ala., July 17, 2019) (at fleeing suspect's urging, resident grabbed a handgun); *State* v. *Davis*, 2000–278, p. 5 (La. App. 5 Cir. 8/29/00), 768 So. 2d 201, 206 (fleeing suspect "reached for a handgun" inside home).

Even if the area outside the home remains tranquil, the suspect inside is free to destroy evidence or continue his escape. Flight is obviously suggestive of these recognized exigencies, which could materialize promptly once the officer is compelled to abandon pursuit. The destruction of evidence can take as little as "15 or 20 seconds," *Banks*, 540 U. S., at 40; and a suspect can dash out the back door just as quickly, while the officer must wait outside. Forcing the officer to wait and predict whether such exigencies *will* occur before entry is in practice no different from forcing the officer to wait for these exigencies *to* occur.

Indeed, from the perspective of the officer, many instances of flight leading to further wrongdoing are the sort of "flight alone" cases the Court deems harmless, *ante*, at 11, n. 3. Despite the Court's suggestion to the contrary, examples of "flight alone" generating exigencies difficult to identify in advance are not hard to find. See, *e.g. State* v. *Lam*, 2013-Ohio-505, 989 N. E. 2d 100, 101–102 (App.) (warrantless entry in hot pursuit of someone who committed turn signal violation revealed heroin on suspect and suggested attempt to flush drugs down the toilet); *State* v. *Mitchem*, 2014-Ohio-2366, 2014 WL 2565680, \*1 (App.,

June 4, 2014) (suspect who committed trespass, fled from the police into private driveway, and stated to officers "[Y]ou can't touch me, I'm at my house," turned out to have a gun). (And, as we will see, it is apparently hard to decide which cases qualify as "flight alone" cases, see *infra*, at 16.)

If the suspect continues to flee through the house, while the officer must wait, even the quickest warrant will be far too late. Only in the best circumstances can one be obtained in under an hour, see Brief for Respondent 33, and it usually takes much longer than that, see Brief for Los Angeles County Police Chiefs' Association as *Amicus Curiae* 24–25. Even electronic warrants may involve "time-consuming formalities." *McNeely*, 569 U. S., at 155. And some States typically require that a warrant application be in writing, see, *e.g.*, Colo. Rev. Stat. §16–3–303 (2020), or that the applicant appear in person before a judge, see, *e.g.*, Mass. Gen. Laws, ch. 276, §2B (2019), or permit oral applications only for certain cases, see, *e.g.*, Iowa Code §321J.10.3 (2019). All of these factors make it very possible that the officer will *never* be able to identify the suspect if he cannot continue the pursuit. See *Hiibel* v. *Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U. S. 177, 186 (2004) (recognizing identification as an "important government interest[]"). The Court today creates "perverse incentives" by imposing an "invitation to impunity-earned-by-recklessness." *Scott*, 555 U. S., at 385–386.

Against these government interests we balance the suspect's privacy interest in a home to which he has voluntarily led a pursuing officer. If the residence is not his the suspect has no privacy interest to protect. *Rakas* v. *Illinois*, 439 U. S. 128, 141 (1978); see also *State* v. *Walker*, 2006–1045, p. 7 (La. 4/11/07), 953 So. 2d 786, 790–791 (suspect fled into third person's residence where he was unwelcome); *Ulysse* v. *State*, 899 So. 2d 1233, 1234 (Fla. App. 2005) (suspect ran inside the home of "a complete stranger"). The police may well have no reason to know whether the suspect entered

his own or someone else's home or yard. If the suspect does escape into his own home, his privacy interest is diminished because he was the one who chose to move his encounter with the police there. See *State* v. *Legg*, 633 N. W. 2d 763, 773 (Iowa 2001) (nature of intrusion is "slight" in hot pursuit because the officer's entry "was no surprise to [the suspect]; he was following closely on her heels"); 4 W. LaFave, Search and Seizure §9.2(d), p. 419 (6th ed. 2020) ("the suspect has only himself to blame for the fact that the encounter has been moved from a public to a private area"). In cases of hot pursuit, "[t]he offender is then not being bothered by the police unexpectedly while in domestic tranquility. He has gone to his home while fleeing solely to escape arrest." *R.* v. *Macooh*, [1993] 2 S. C. R. 802, 815. Put differently, just as arrestees have "reduced privacy interests," *Riley*, 573 U. S., at 391, so too do those who evade arrest by leading the police on car chases into their garages.

## C

"In determining what is reasonable under the Fourth Amendment, we have given great weight to the essential interest in readily administrable rules." *Virginia* v. *Moore*, 553 U. S. 164, 175 (2008) (internal quotation marks omitted). This is particularly true with respect to the rules governing exceptions to the warrant requirement because of exigent circumstances. See *Mitchell*, 588 U. S., at ___, n. 3 (slip op., at 9, n. 3). And contrary to the Court's suggestion, the home is not immune from the application of such rules consistent with the Fourth Amendment. See, *e.g.*, *Summers*, 452 U. S., at 705; *Chimel* v. *California*, 395 U. S. 752, 763 (1969).

Like most rules, this one is not without exceptions or qualifications. The police cannot manufacture an unnecessary pursuit to enable a search of a home rather than to execute an arrest. Cf. *Fernandez* v. *California*, 571 U. S. 292, 302 (2014) ("evidence that the police have removed the

potentially objecting tenant from the entrance for the sake of avoiding possible objection" would be probative of the objective unreasonableness of a warrantless entry based on the consent of another occupant). Additionally, if a reasonable officer would not believe that the suspect fled into the home to "thwart an otherwise proper arrest," *Santana*, 427 U. S., at 42, warrantless entry would not be reasonable.

Additional safeguards limit the potential for abuse. The officer must in all events effect a reasonable entry. *United States* v. *Ramirez*, 523 U. S. 65, 71 (1998). As the lower courts have recognized, hot pursuit gives the officer authority to enter a home, but "it does not have any bearing on the constitutionality of the manner in which he enters the home." *Trent* v. *Wade*, 776 F. 3d 368, 382 (CA5 2015). And his authority to search is circumscribed, limited to "those spaces where a person may be found" for "no longer than it takes to complete the arrest and depart the premises." *Maryland* v. *Buie*, 494 U. S. 325, 335–336 (1990). Finally, arrests conducted "in an extraordinary manner, unusually harmful to an individual's privacy or even physical interests" are subject to even more stringent review. *Whren* v. *United States*, 517 U. S. 806, 818 (1996).

Courts must also ascertain whether a given set of circumstances actually qualifies as hot pursuit. While the flight need not be reminiscent of the opening scene of a James Bond film, there must be "some sort of a chase." *Santana*, 427 U. S., at 43. The pursuit must be "immediate or continuous." *Welsh* v. *Wisconsin*, 466 U. S. 740, 753 (1984). And the suspect should have known the officer intended for him to stop. Cf. *Michigan* v. *Chesternut*, 486 U. S. 567, 573–574 (1988). Where a suspect, for example, chooses to end a voluntary conversation with law enforcement and go inside her home, that does not constitute flight. *Florida* v. *Royer*, 460 U. S. 491, 497–498 (1983) (plurality opinion).

Because the California Court of Appeals assumed that hot pursuit categorically permits warrantless entry, I

would vacate the decision below to allow consideration of whether the circumstances at issue in this case fall within an exception to the general rule of the sort outlined above. Lange would be free to argue that his is the "unusual case," *Mitchell*, 588 U. S., at \_\_\_\_ (plurality opinion) (slip op., at 16), in which the general rule that hot pursuit justifies warrantless entry does not apply.

## II

Now consider the regime the Court imposes. In rejecting the *amicus*' proposed categorical rule favoring warrantless home entry, the Court creates a categorical rule of its own: Flight alone can never justify warrantless entry into a home or its curtilage. Instead, flight is but one factor of unclear weight to "consider," *ante,* at 16, and it must be supplemented with at least one additional exigency. This is necessary, the Court explains, because people "flee for innocuous reasons," *ante*, at 10, although the Court offers just two actual examples of "innocuous" flight, the harmlessness of which would not have been apparent to the police, see *ibid.* (citing *Carroll* v. *Ellington*, 800 F. 3d 154, 162 (CA5 2015; *Mascorro* v. *Billings*, 656 F. 3d 1198, 1202 (CA10 2011)).

In order to create a hot pursuit rule ostensibly specific to misdemeanors, the Court must turn to a case concerning neither misdemeanors nor hot pursuit. In *Welsh* v. *Wisconsin*, we held that the warrantless entry of a drunk driver's home to arrest him for a nonjailable offense violated the Fourth Amendment. 466 U. S., at 754. The Court relies on *Welsh* for the proposition that "when a minor offense alone is involved . . . officers can probably take the time to get a warrant" to execute an arrest. *Ante*, at 9–10. The Court's determination that *Welsh* applies to all cases involving "minor" offenses—although we never learn what qualifies as a minor offense—ignores that we have already declined to apply *Welsh* to cases involving misdemeanors because of the "significant" distinction between nonjailable offenses and

misdemeanors. *McArthur*, 531 U. S., at 336. And in any event, we explicitly differentiated the circumstances at issue in *Welsh* from "immediate or continuous pursuit of [a person] from the scene of a crime." 466 U. S., at 753; see *Brigham City*, 547 U. S., at 405 (rejecting *Welsh*'s application to a situation involving exigent circumstance of emergency aid). Accordingly, as we have already held, "nothing in [*Welsh*] establishes that the seriousness of the crime is equally important *in cases of hot pursuit*." *Stanton*, 571 U. S., at 9 (emphasis in original). The Court's citation to Justice Jackson's concurrence in *McDonald* v. *United States*, 335 U. S. 451 (1948), *ante,* at 11, n. 3, is similarly inapt. That case involved entry for mere "follow[] up," not anything resembling hot pursuit. *McDonald*, 335 U. S., at 459.

The Court next limits its consideration of the interests at stake to a balancing of what it perceives to be the government's interest in capturing innocuous misdemeanants against a person's privacy interest in his home. The question, however, is not whether "litter[ing]" presents risks to public safety or the potential for escape, *ante*, at 8, but whether *flight* does so. And flight from the police is never innocuous.

The Court ultimately decides that, when it comes to misdemeanors, States do not have as much of an interest in seeing such laws enforced. But, as the Court concedes, we have already rejected as "untenable" the "assumption that a 'felon' is more dangerous than a misdemeanant." *Tennessee* v. *Garner*, 471 U. S. 1, 14 (1985). This is so because "numerous misdemeanors involve conduct more dangerous than many felonies." *Ibid.* At any rate, the fact that a suspect flees when suspected of a minor offense could well be indicative of a larger danger, given that he has voluntarily exposed himself to much higher criminal penalties in exchange for the prospect of escaping or delaying arrest. Cf. *Illinois* v. *Wardlow*, 528 U. S. 119, 124 (2000).

The Court's rule is also famously difficult to apply. The difference between the two categories of offenses is esoteric, to say the least. See *Atwater*, 532 U. S., at 350; *Berkemer* v. *McCarty*, 468 U. S. 420, 431, n. 13 (1984) ("[O]fficers in the field frequently have neither the time nor the competence to determine the severity of the offense for which they are considering arresting a person." (internal quotation marks omitted)). For example, driving while under the influence is a misdemeanor in many States, but becomes a felony if the suspect is a serial drunk driver. See, *e.g.*, Alaska Stat. §28.35.030(n) (2020). Drug possession may be a misdemeanor or a felony depending on the weight of the drugs. See, *e.g.*, Ohio Rev. Code Ann. §2925.11(C) (Lexis 2019) (outlining 50 potential iterations of unlawful drug possession, some misdemeanors others felonies). Layer on top of this that for certain offenses the exact same conduct may be charged as a misdemeanor or felony depending on the discretionary decisions of the prosecutor and the judge (what California refers to as a "wobbler"), and we have a recipe for paralysis in the face of flight. See Cal. Penal Code Ann. §§486–490.1 (West Cum. Supp. 2021) (classifying theft as an infraction, misdemeanor, wobbler, or felony depending on the value of the stolen item).

The Court permits constitutional protections to vary based on how each State has chosen to classify a given offense. For example, "human trafficking" can be a misdemeanor in Maryland, Md. Crim. Law Code Ann. §3–1102(c)(1) (2019), contra, Tex. Penal Code Ann. §20A.02 (West 2021), and in Pennsylvania so can involuntary manslaughter, 18 Pa. Cons. Stat. §2504(b) (2015); contra, Ohio Rev. Code Ann. §2903.04(C). The vehicular flight at issue in this very case is classified as a felony in several States. See, *e.g.,* Fla. Stat. §316.1935 (2014); Del. Code Ann., Tit. 21, §4103 (2013). Law enforcement entities and state governments across the Nation tell us that they have accord-

ingly developed standards for warrantless entry in hot pursuit tailored to their respective legal regimes. See Brief for Los Angeles County Police Chiefs' Association as *Amicus Curiae* 14–20; Brief for State of Ohio et al. as *Amici Curiae* 25. Given the distinct nature of each State's legal code, such an approach is more appropriate than the Court's blunt constitutional reform.

For all these reasons, we have not crafted constitutional rules based on the distinction between modern day misdemeanors and felonies. In *Tennessee* v. *Garner*, for example, we held that deadly force could not categorically be used to seize a fleeing felon, even though the common law supplied such a rule, because at common law the "gulf between the felonies and the minor offences was broad and deep," but today it is "minor and often arbitrary." 471 U. S., at 14 (internal quotation marks omitted).

Similarly, in *Atwater*, we held that the general probable-cause rule for warrantless arrests applied to "even a very minor criminal offense," "without the need to balance the interests and circumstances involved in particular situations." 532 U. S., at 354 (internal quotation marks omitted). We explained that we could not expect every police officer to automatically recall "the details of frequently complex penalty schemes," and concluded that distinguishing between "permissible and impermissible arrests for minor crimes" was a "very unsatisfactory line to require police officers to draw on a moment's notice." *Id.*, at 348, 350 (internal quotation marks and alteration omitted).

The Court's approach is hopelessly indeterminate in other respects as well. The Court admonishes law enforcement to distinguish between "dangerous offender[s]" and "scared teenager[s]," *ante,* at 11, as if an officer can easily tell one from the other, and as if the two categories are mutually exclusive. See Dept. of Justice, Office of Juvenile Justice and Delinquency Prevention, Offending by Juveniles (Mar. 31, 2020) (about 16% of serious violent crimes in

the United States from 2007 to 2017 were committed by juveniles). And police are instructed to wait for a warrant if there is sufficient "time," *ante*, at 16, but they are not told time before *what*, how many hours the Court would have them wait, and what to do if other "pressing needs" arise. See *Mitchell*, 588 U. S., at ___ (plurality opinion) (slip op., at 9) ("[A]n officer's duty to attend to more pressing needs may leave no time to seek a warrant.").

The Court tut-tuts that we are making far too much of all this, and that our "alarmism [is] misplaced." *Ante*, at 11, n. 3. In fact, the Court says, its "approach will in many, if not most, cases allow a warrantless home entry." *Ante*, at 11. In support of that assurance, the Court lists several "exigencies above and beyond the flight itself" that would permit home entry, notably when "the fleeing misdemeanant" will "escape from the home." *Ante,* at 11, n. 3. If an officer "reasonably believes" such an exigency exists," the Court says, "he does not need a categorical misdemeanor-pursuit rule to justify a warrantless home entry." *Ibid.*

When a suspect flees into a dwelling there typically will be another way out, such as a back door or fire escape. See Cal. Code Regs., tit. 24, §§1113.2, 1114.8 (2019) (apartments, floors of high-rise buildings, and many other homes must have access to at least two means of egress). If the officer reasonably believes there are multiple exits, then surely the officer can conclude that the suspect might well "escape from the home," *ante*, at 11, n. 3, by running out the back, rather than "slowing down and wiping his brow" while the officer attempts to get a warrant. *Scott*, 550 U. S., at 385. Under the Court's rule warrantless entry into a home in hot pursuit of a fleeing misdemeanant would presumably be permissible, as long as the officer reasonably believed the home had another exit. Question: Is that correct? Police in the field deserve to know.

But the Court will not answer the question, leaving it to the officer to figure out in the midst of hot pursuit. The

answer apparently depends on whether the police "believe anything harmful will happen in the time it takes to get a warrant," *ante*, at 11, n. 3, but again, what the police reasonably believe will happen is of course that the suspect will continue his flight and escape out the back. If that reasonable belief is an exigency, then it is present in almost every case of hot pursuit into the home. Perhaps that is why Lange's counsel admitted that "nine times out of ten or more" warrantless entry in hot pursuit of misdemeanants would be reasonable. Tr. of Oral Arg. 34.

### III

Although the Fourth Amendment is not "frozen" in time, we have used the common law as a reference point for assessing the reasonableness of police activity. *Garner*, 471 U. S., at 13. The Court errs, however, in concluding with the suggestion that history supports its novel incentive to flee.

The history is not nearly as clear as the Court suggests. The Court is forced to rely on an argument by negative implication: if common law authorities supported a categorical rule favoring warrantless entry in pursuit of felons, warrantless entry in pursuit of misdemeanants must have been prohibited. That is wrong. Countless sources support the proposition that officers could and did pursue into homes those who had committed all sorts of offenses that the Court seems to deem "minor." *Ante*, at 8.

For example, common law authorities describe with approval warrantless home entry in pursuit of those who had committed an affray (public fighting), 1 W. Hawkins, Pleas of the Crown 137 (1716), and "disorderly drinking," W. Simpson, The Practical Justice of the Peace and the Parish Officer 26 (1761). And the doctrine of "hue and cry" permitted townspeople to pursue those suspected of "misdemeanor[s]" if the perpetrator "escape[d] into [his] house." R. Bevill, Law of Homicide 162–163 (1799). In colonial

America, the hue and cry extended to a "great diversity of crimes," including stealing livestock and revealing oneself to be a Quaker.  W. Cuddihy, The Fourth Amendment: Origins and Original Meaning 244–246 (2009).

Finally, at common law an officer could "break open Doors, in order to apprehend Offenders" whenever a person was arrested for "*any Cause*," and thereafter escaped.  2 Hawkins, Pleas of the Crown, at 86–87 (1787) (emphasis added).  The Court's attempt to dispose of this awkward reality in a footnote, *ante,* at 14, n. 5, is unconvincing.  Flight and escape both present attempts to "thwart an otherwise proper arrest," *Santana*, 427 U. S., at 42, and as noted, the common law did not differentiate among escapees based on the perceived magnitude of their underlying offense, R. Burn, The Justice of the Peace 101–103 (14th ed. 1780).

Clearly the list of offenses that historically justified warrantless home entry in hot pursuit of a fleeing suspect were as broad and varied as those found in a contemporary compilation of misdemeanors.  See also *Macooh*, [1993] 2 S. C. R., at 817 (concluding after review that at common law "the right to enter in hot pursuit" was not "limited to arrest for felonies"); *Lyons* v. *R.*, [1984] 2 S. C. R. 633, 657 (recognizing "right of pursuit" as a longstanding exception to common law protection of the sanctity of the home).

In the face of this evidence, the Court fails to cite a single circumstance in which warrantless entry in hot pursuit was found to be unlawful at common law.  It then acknowledges that "some of the specifics are uncertain, and commentators did not always agree with each other."  *Ante,* at 14.  In *Atwater,* we declined to forbid warrantless arrests for minor offenses when we found "disagreement, not unanimity, among both the common-law jurists and the text writers who sought to pull the cases together."  532 U. S., at 332.  The historical ambiguity is at least as pervasive here.

Even if the common law practice surrounding hot pursuit were unassailably clear, its treatment of the topic before us

would still be incomplete. That is because the common law did not recognize the remedy Lange seeks: exclusion of evidence in a criminal case. *Collins*, 584 U. S., at \_\_\_ (slip op., at 2) (THOMAS, J., concurring). It is often difficult to conceive of how common law rights were influenced by the absence of modern remedies. And in this case we have no guidance from history as to how our doctrines surrounding the exclusionary rule, such as inevitable discovery, would map onto situations in which a person attempts to thwart a public arrest by retreating to a private place. See *Nix* v. *Williams*, 467 U. S. 431, 443–444 (1984).

\*    \*    \*

Recall the assault we started with. The officer was closing in on the suspect when he hopped the fence and stopped in a yard. The officer starts to climb over the fence to arrest him, but wait—was the assault a misdemeanor or a felony? In Lange's State of California, it could have been either depending on the identity of the victim, the amount of force used, and whether there was a weapon involved. See Cal. Penal Code Ann. §245 (West 2014). How much force was the man using against the teenager? Is this really the assailant's home in the first place? Pretty suspicious that he jumped the fence just as the officer was about to grab him. If it is his home, are there people inside and, if so, how many? And why would the man run from a mere fight—does he have something more serious to hide?

By this time, of course, the assailant has probably gone out the back door or down the fire escape and is blocks away, with the officer unable to give a useful description—except for how he looks from behind.